*507 OPINION OF THE COURT
Stanley L. Sklar, J.
The principal issue presented is whether plaintiff has stated a cause of action under Public Health Law § 2801-d, which provides a private right of action to nursing home patients injured as a result of a deprivation of any right or benefit established for that patient’s well-being by contract or state or federal statute, code, rule or regulation, even if the plaintiff has simultaneously asserted traditional medical malpractice and negligence claims.
This is an action commenced by the administratrix of the estate of Jacqueline Jeudy arising out of care rendered to her, while she was in her 80s, at the Terence Cardinal Cooke Health Care Center, a nursing home where Jeudy resided between April 5-17, 2002. The complaint alleges that Jeudy was a “Medicaid/ Medicare recipient” and that the Center received payments under both programs in connection with the care provided to her.
Plaintiff claims that because Jeudy suffered from “congestive heart failure, recent respiratory arrest, cardiac arterial bypass grafting, an ejection fraction of 15 to 25%, recent critical care polyneuropathy with pneumonia, hemiplegi[a] [and was] alert and responsive to verbal cues, moving her lips but [was] voiceless and required close supervision and pulmonary toilet of her tracheotomy,” she was at high risk for respiratory arrest. (Complaint 1i 26.) Plaintiff further claims that because defendants (apparently referring to the Center and named defendants Drs. Anthony Lechich and Jainder Sawhney) “failed to provide and implement an adequate and reasonable plan of care” to Jeudy, she was caused to “plug from mucous secretions” thereby leading to “respiratory arrest, anoxic brain injury and death.” (Complaint 1Í 27.) The complaint further alleges, inter alia, that the Center had “inadequate facilities and personnel to care for plaintiff’ and that she was subject to “significant medication error.” (Id. 1111 44-45.)
The complaint which asserts claims for conscious pain and suffering and wrongful death is premised on negligence/ malpractice and a lack of informed consent and also seeks relief pursuant to Public Health Law § 2801-d. Public Health Law § 2801-d provides in relevant part that:
“1. Any residential health care facility that deprives any patient of said facility of any right or benefit, as *508 hereinafter defined, shall be liable to said patient for injuries suffered as a result of said deprivation, except as hereinafter provided. For purposes of this section a ‘right or benefit’ of a patient of a residential health care facility shall mean any right or benefit created or established for the well-being of the patient by the terms of any contract, by any state statute, code, rule or regulation or by any applicable federal statute, code, rule or regulation, where noncompliance by said facility with such statute, code, rule or regulation has not been expressly authorized by the appropriate governmental authority.
No person who pleads and proves, as an affirmative defense, that the facility exercised all care reasonably necessary to prevent and limit the deprivation and injury for which liability is asserted shall be liable under this section.
“2. Upon a finding that a patient has been deprived of a right or benefit and that said patient has been injured as a result of said deprivation, and unless there is a finding that the facility exercised all care reasonably necessary to prevent and limit the deprivation and injury to the patient, compensatory damages shall be assessed in an amount sufficient to compensate such patient for such injury, but in no event less than twenty-five percent of the daily per-patient rate of payment established for the residential health care facility under section twenty-eight hundred seven of this article or, in the case of a residential health care facility not having such an established rate, the average daily total charges per patient for said facility, for each day that such injury exists. In addition, where the deprivation of any such right or benefit is found to have been willful or in reckless disregard of the lawful rights of the patient, punitive damages may be assessed.”
Such remedies “are in addition to and cumulative with any other remedies available to a patient, at law or in equity or by administrative proceedings.” (Public Health Law § 2801-d [4].) If successful under this section, the court is empowered in its discretion to award attorneys’ fees. (Public Health Law § 2801-d [6].)
Plaintiff’s Public Health Law § 2801-d cause of action is premised, inter alia, on a deprivation of Jeudy’s right to appropriate medical and nursing care pursuant to her contract *509 with the Center (see complaint 1Í 43) as well as deprivations of her alleged right to receive adequate and appropriate medical care pursuant to 10 NYCRR 415.3 (see complaint H 48) and apparently Public Health Law § 2803-c (see affidavit in opposition 11 9).* To the extent that plaintiff is claiming that the Center failed to provide an adequate and reasonable plan of care for Jeudy, plaintiff may also be claiming a deprivation of rights under 10 NYCRR 415.11 which pertains to resident assessment and care planning. Plaintiff who also alleges the failure to implement an adequate plan of care relies on 10 NYCRR 415.12 asserting that the Center had inadequate facilities and personnel to care for the patient. (See complaint 11 44.) It is unclear whether plaintiff is claiming a deprivation, under subdivision (k) of 10 NYCRR 415.12, of proper care and treatment for Jeudy’s tracheostomy (tracheotomy).
Defendants Dr. Lechich and the Center now move for an order pursuant to CPLR 3211 (a) (7) dismissing plaintiffs Public Health Law § 2801-d cause of action and dismissing the complaint entirely as to Dr. Lechich.
Movants assert that plaintiffs claims sound in medical malpractice and that Public Health Law § 2801-d does not apply to routine malpractice and negligence claims because otherwise every such case would be converted into a civil rights action, a result, defendants urge, that could not have been intended by the Legislature. Thus movants claim that plaintiff’s Public Health Law cause of action fails to state a cause of action. Movants therefore seek dismissal of such cause of action.
That application is denied. Initially it should be noted that no preliminary conference has been held in this case, and there is no indication that bills of particulars have been provided, since none was attached to the motion papers. Thus plaintiffs claims have not been fully fleshed out. After perusing the complaint as a whole and reviewing the case law and the legislative history it cannot be said that the complaint fails to state a cause of action under Public Health Law § 2801-d.
In January 1975 when Hugh Carey became Governor “the public’s confidence in the State’s ability to protect its most defenseless citizens, the aged and infirm, had been destroyed by a series of dramatic disclosures highlighting the abuses of nursing home care in their State.” (See Governor’s Mem approving *510 L 1975, ch 658, 1975 McKinney’s Session Laws of NY, at 1764.) The Governor then took immediate steps including the appointment of a special prosecutor to commence a statewide investigation into claims of unlawful activities by those operating nursing homes, the hiring of additional auditors to monitor the finances of nursing homes and the setting up of the Moreland Commission to investigate “a system which invites excessive private gain and apparent conflict of interests,” and “recommend new laws and procedures to help those who depend on nursing homes . . . which receive public funds” (see, Crises Resolution — Fiscal Problems, Nursing Home Crisis, Public Papers of [Governor] Hugh L. Carey, at 1858-1859).
In appointing Morris Abram, a former Nuremberg Trials prosecutor, as Commissioner of the Moreland Commission, Governor Carey stated that “[a] serious public concern has been expressed as to the quality of care provided by nursing homes” and that the public has lost confidence in the “government’s ability to assure the efficient delivery of health and related services.” (Executive Order [Carey] No. 2 [9 NYCRR 3.2].) Governor Carey further indicated that “the State regulatory structure must be evaluated to insure that nursing homes . . . provide the highest quality of care with the greatest degree of economy.” (Ibid.)
In May 1975 the Governor sent 11 bills resulting from the Commission’s work to the Legislature. Those bills included Public Health Law § 2801-d (“Private actions by patients of residential health care facilities”) and Public Health Law § 2803-c (“Rights of patients in certain medical facilities”). In his letter to the Legislature accompanying those bills the Governor advised that it was his “hope” that the “health care crisis . . . involving the most defenseless of our citizens, the aged and infirm . . . could be met by solutions, which would insure a higher level of care and treatment in facilities caring for these groups.” (Bill Jacket, L 1975, ch 648). He advised the Legislature in that letter that the bills were “designed to deal directly with the most serious immediate problems which have been uncovered with respect to the nursing home industry, and particularly to insure the deterrence of poor care and fraud and the strengthening of governmental controls.”
The Bill Jacket for chapter 648 of the Laws of 1975, which relates to the proposed addition of Public Health Law § 2803-c, contains a memorandum from its sponsor, Senator Karen Burstein, which summarizes the provisions of that *511 statute which requires nursing homes to adopt and make public a statement of the rights and responsibilities of patients in such facilities and to treat those patients in accordance with such statement which “shall include” the patients’ “rights to adequate medical care.” The stated purpose of that proposed statute was “to establish for the care of patients in nursing home certain minimum standards” (ibid.) set forth in a patient’s bill of rights. The justification for this proposed legislation was that “no such minimum standards exist for the contract between a nursing home and its patients.” (Ibid.) The memorandum noted that according to an October 10, 1974 New York Times article “investigations of private nursing homes revealed widespread instances ‘of understaffing and underfeeding, padding of bills, kickbacks, safety violations and self-dealing devices for raising medicaid rates.’ ” (Id.) In justifying the bill the memorandum went on to point out that similar legislation had been passed by other states and had been introduced on the federal level by Congressman Cohen who observed that:
“[MJajor changes in the American family structure . . . [had] made it increasingly difficult for the elderly to receive the care and assistance they need within the family setting . . . millions of elderly Americans are now living in nursing homes . . . tragically ... a significant percentage of the homes fall far short of the standard of care their patients need.” (Id.)
Burstein’s memorandum further indicated that our State “has a responsibility to those of its citizens who for so many years contributed labor and energy to New York. Assuring them of humane treatment in the facilities with which they contract for care is a small but necessary step in meeting that responsibility.” (Id.)
The transcripts of the Senate debates relating to Public Health Law § 2803-c indicate that its purpose was to provide nursing home patients with certain rights, including “the right to receive adequate and appropriate medical care” (see, Public Health Law § 2803-c [3] [e]), and with a bill of rights advising those patients of their rights. (New York State Senate Debate Transcript, May 13, 1975, at 4521, 4525.) Senator Burstein indicated that some of the rights set forth in the bill of rights existed previously but that advocates in the field believed it important that they be put into Public Health Law § 2803-c “so that they stand both as a statement of our purpose and as a shield against abuses.” (Transcript at 4527.) Senator Burstein *512 informed her colleagues in terms of enforcing Public Health Law § 2803-c, that in addition to civil penalties and injunctive relief there were “further reliefs that [could] be afforded individuals who have their rights violated under the chapter.” (Transcript at 4557-4558.)
Senator Burstein, who was concerned about nursing homes becoming “warehouses for human waste” (see Transcript at 4584) and believed that there were those who were leaving the community and moving into nursing homes where they were effectively “ceas[ing] to be a human being and a citizen with all the rights that all of us have,” was “simply trying to provide in this patient bill of rights . . . the minimum standard by which such people shall be treated and the minimum rights to which they may feel they have an absolute opportunity to see vindicated.” (Id. at 4568-4569.) Senator Burstein stated that these are rights that “ought to exist and perhaps we would say they are insurance in their nature of being a United States citizen.” (Transcript at 4527.) Accordingly, since the bill of rights was only a “meager bill” which would merely set forth minimum standards, Senator Burstein did not believe that it would open up the medical profession to additional malpractice suits. (Id. at 4569.) She further noted that people from a variety of health professions had been sitting in at the Health Committee meeting, and that she had not “gotten a statement from the American Medical Association arguing that they are going to be open to all kinds of malpractice suits.” (Transcript at 4583.)
Senator Gold in debating the bill indicated that if the Senate agreed to each of the statements set forth in the proposed bill of rights then they should be enacted into law, and that any doctor who violates that is violating the law and “perhaps should be penalized” since the bill contains “some of the standards that we want the medical profession to live up to . . . and if they do violate it, let’s hold them to it.” (Transcript at 4565, 4566.)
In the Commission’s Summary Report, the Commission indicated that Public Health Law § 2801-d provided for liability to a patient of a facility which deprived the patient “of rights or benefits created for his well being by federal or state law or pursuant to contract” which deprivation resulted in injury to the patient. The Commission stated that this statute “introduce [s] a degree of equality between nursing homes and their otherwise vulnerable and helpless patients and, through private litigation brought by patients either in individual or class action lawsuit, provides a supplemental mechanism for the enforcement of *513 existing standards of care.” The Summary further observed that most nursing home patients are devoid of the financial resources to bring a lawsuit and that therefore Public Health Law § 2801-d provides incentives “for the private bar to handle meritorious suits,” such as the provisions for minimum compensatory damages, punitive damages where the facility’s actions are willful or reckless, and enabling the court to award successful litigants reasonable attorneys’ fees. The Summary also noted that Public Health Law § 2801-d (9) prohibits Medicaid reimbursement for any insurance premium attributable solely to insurance coverage of liability under Public Health Law § 2801-d and that “in most cases the liability and malpractice insurance currently carried by most facilities would cover statutory liability for injuries to patients.”
The Memorandum of the State Executive Department relating to Public Health Law § 2801-d (see 1975 McKinney’s Session Laws of NY, at 1685) which observes that nursing home patients “are largely helpless and isolated” (at 1686), that many are “without even occasional visitors” (id.) and that “[m]ost cannot afford attorneys” (id.) indicates that the purpose of that bill was to provide nursing home patients “with increased powers to enforce their rights to adequate treatment and care by providing them with a private right of action to sue for damages and other relief and enabling them to bring such suits as class actions” (at 1685). That memorandum states that the proposed Public Health Law § 2801-d “create[s] incentives which would encourage private non-governmental parties [i.e., plaintiffs’ attorneys] to help protect the rights of nursing home patients” (at 1685-1686). It further notes that the proposed statute’s minimum compensatory damages would serve to discourage the diversion of cash provided by the government for the benefit of patients “to improper or personal use. In effect the delivery of better care would become less expensive than its wrongful denial” (at 1686).
All but 1 of the 11 provisions recommended by the Commission were enacted including Public Health Law §§ 2801-d and 2803-c. The Governor’s Memorandum on approving the 10 bills (see 1975 McKinney’s Session Laws of NY, at 1764) states that one of the bills “enacts a forceful bill of rights for patients in nursing homes which will guarantee them the dignity and privacy that is their due” and that another creates “a patient’s right of action against a facility which fails to meet required standards of care.” The memorandum further indicates that *514 this legislation “goes far in assuring that elderly and disabled New Yorkers who must look to nursing homes when they can no longer take care of themselves can find there the quality of care they seek and deserve.” {Ibid, at 1765.)
After reviewing the legislative history and case law I find that as a pleading matter plaintiffs complaint is adequate to state a cause of action under Public Health Law § 2801-d. The legislative history evinces an intent to provide an additional avenue of relief to the vulnerable nursing home population to insure that their rights are enforced. (See Doe v Westfall Health Care Ctr., 303 AD2d 102, 111-112 [4th Dept 2002]; Zeides v Hebrew Home for Aged at Riverdale, 300 AD2d 178 [1st Dept 2002], rearg denied 306 AD2d 959 [2003], appeal withdrawn 1 NY3d 623 [2004].) The legislative history demonstrates that the Legislature was aware that incentives were needed to induce attorneys to bring suits on behalf of injured patients, so as to deter future deprivations and compensate those who are injured. The reality is that many lawyers will decline a meritorious case when dealing with an individual who has a limited life expectancy, who is not a wage earner, and who is not supporting or providing services to others, and thus where damages are limited. This is precisely the case with many nursing home residents; hence the need for the enactment of incentives. (See Doe, supra at 109, 111-112.) Public Health Law § 2801-d does not only apply to reckless or willful deprivations of patients’ rights because if it did there would be no need to provide for imposition of punitive damages in such a case. {See Public Health Law § 2801-d [2].)
Plaintiffs allegations here regarding subjecting Jeudy to significant medication error and the failures to properly provide and implement a plan of care and to provide adequate facilities and personnel to care for Jeudy, who allegedly required close supervision and was at high risk for respiratory arrest, thereby causing her to plug from mucous and suffer respiratory arrest, brain injury and death are sufficient to state a claim under Public Health Law § 2801-d. Thus, the branch of the motion seeking dismissal of that cause of action is denied.
This leaves the branch of the motion which seeks dismissal of the complaint as to Dr. Lechich, the Center’s medical director, based on his assertions that he never saw or treated Jeudy while she resided there, nor was he asked to offer his opinion in consultation about her treatment. Dr. Lechich also states that his signature does not appear anywhere in the chart. In opposition plaintiffs counsel does not deny that Dr. Lechich was not *515 involved directly in Jeudy’s care. (See also complaint 11 30.) Instead plaintiffs counsel urges in effect that as medical director he had responsibilities of a supervisory and administrative nature. Looking at the complaint in the light most favorable to plaintiff, in this case where little if any discovery has been had and no preliminary conference has been held, plaintiff seems to be alleging that Dr. Lechich, as the Center’s administrator, was negligent in failing to make sure that federal and state laws and regulations were implemented and adhered to evidently with respect to the adequacy of the Center’s facilities and staffing and in failing to ensure that adequate plans of care were developed for the Center’s residents (see, 10 NYCRR 415.11). This is adequate to state claims for Jeudy’s conscious pain and suffering and wrongful death based on Dr. Lechich’s alleged negligence and pursuant to Public Health Law § 2801-d. Nonetheless as to Dr. Lechich it is inadequate to state claims for wrongful death and conscious pain and suffering arising out of medical malpractice and lack of informed consent. Accordingly, any such claims of medical malpractice and lack of informed consent are dismissed as to him. The motion is otherwise denied.

 While the complaint alleges various deprivations under other regulations, it is unclear on this record whether any such deprivations injured Jeudy.